AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. |
| Facebook account with username "Shannon Collins" and Facebook user #10154756233587823 | ) |
| | ) |

Case No. **18MJ3348**

FILED
JUN 15 2018
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-2.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960 | Importation of a Controlled Substance |
| 21 U.S.C. 841, 846 | Distribution of a Controlled Substance and Conspiracy |
| 21 U.S.C. 843 | Illegal Use of a Communication Facility |

The application is based on these facts:

See attached affidavit of Michael J. Rod.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael J. Rod, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/14/18

_____
*Judge's signature*

City and state: San Diego, California

Hon. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

## PROPERTY TO BE SEARCHED

Information associated with the Facebook account that is stored at premises controlled by Facebook, a company whose headquarters is located at 1601 Willow Road, Menlo Park, CA:

a. Facebook username "Shannon Collins" associated with Facebook user #10154756233587823, with Facebook vanity name "pathwayhome2003" and used by Shannon COLLINS (**Target Account-2**).

## ATTACHMENT B-2

### I.     Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.    Items to be Provided by Facebook, Inc.

Any and all records, files, logs, or information (whether deleted or not) concerning:

A.      All records or other information regarding the identification of the account, to include subscriber information, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

B.      Any and all phone detail identification information;

C.      All videos stored by an individual using this account;

D.      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

E.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

F.      All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them to include EXIF data;

G.      All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes;

Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

H.    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

I.    All "check ins" and other location information;

J.    All IP logs, including all records of the IP addresses that logged into the account;

K.    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

L.    All information about the Facebook pages that the account is or was a "fan" of;

M.    All past and present lists of friends created by the account;

N.    All records of Facebook searches performed by the account;

O.    All information about the user's access and use of Facebook Marketplace;

P.    The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

Q.    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

R.    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

S.    All email communications to include but not limited to; sent, received, deleted, drafted, and stored in the accounts listed above.

T.    All Facebook Messenger communications to include but not limited to; sent, received, deleted, drafted, and stored in the accounts listed above.

//

//

## III.   Items to be Seized as Evidence

The search of the data supplied by the Facebook, Inc. pursuant to this warrant will be conducted by FBI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the seizure of data, such as communications, records, photos, videos, and location data, for the period from **February 1, 2018 to and including June 14, 2018**:

(a)   tending to identify attempts to import methamphetamine or some other controlled substance from Mexico and distribute the controlled substance in the United States;

(b)   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling and distribution of methamphetamine or some other controlled substance from Mexico into, and through, the United States;

(c)   tending to identify co-conspirators, criminal associates, or others involved in smuggling and distribution of methamphetamine or some other controlled substance from Mexico into the United States;

(d)   tending to identify travel to or presence at locations involved in the smuggling and distribution of methamphetamine or some other controlled substance, such as stash houses, load houses, or delivery points;

(e)   tending to identify the user of, or persons with control over or access to, the subject account; and/or

(f)   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of 21 U.S.C. § 841, 846, 952, 960, and 843.**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Michael J. Rod, being duly sworn, declare and state:

### PURPOSE OF AFFIDAVIT

1.     This affidavit supports applications for warrants to search the following Facebook[1] accounts:

      a.     Facebook username "John Switzer" associated with Facebook user #10151558794321538, with Facebook vanity name "john.switzer.7777" and used by John SWITZER (**Target Account-1**); and

      b.     Facebook username "Shannon Collins" associated with Facebook user #10154756233587823, with Facebook vanity name "pathwayhome2003" and used by Shannon COLLINS (**Target Account-2**);

as described in Attachments A-1 and A-2.

2.     Based on the information below, there is probable cause to believe evidence of crimes in violation of Title 21, United States Code, Sections 841, 846, 952, 960 and 843 (Distribution of Controlled Substances, Conspiracy to Distribute Controlled Substances, Importation of a Controlled Substance, Illegal Use of a Communication Facility), as described in Attachments B-1 and B-2 will be found on the **Target Accounts**.

3.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by task force officers from the North County Regional Gang Task Force (NCRGTF) or other multi-agency federal, state, and local drug/gang task force officers with whom I have spoken, whom were involved in this investigation, or whose reports I have read and reviewed. In this affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded language in parenthesis and/or

---

[1]     Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025 is an Internet company which, among other things, provides electronic communication services to subscribers. Facebook's electronic Messenger service allows subscribers to communicate with other ISP subscribers through the Internet. Subscribers to Facebook use unique screen names and/or email addresses during communications with others.  The screen names and/or email addresses may or may not identify the real name of the person using a particular screen name or email account

brackets. Those interpretations are based upon my training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

4.   Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified above, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

## TRAINING AND EXPERTISE

5.   I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

6.   I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed since May 2010. I am currently assigned to the San Diego Field Division, North County Resident Agency. Prior to joining the FBI, I was a United States Marine Corps Judge Advocate serving on active duty from November 2001 until May 2010.  In my capacity as a Judge Advocate, I prosecuted and defended violations of the Uniform Code of Military Justice, acted as the Investigating Officer during criminal proceedings, provided legal assistance to service members, and advised military commanders on a wide variety of civil and administrative matters.

7.   I have received twenty-one (21) weeks of training at the FBI Academy in Quantico, Virginia.  During that training, I received instruction regarding a wide variety of investigative techniques that are commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of sources, electronic surveillance techniques, law enforcement tactics, search and seizure laws and techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects. I have acted as the lead investigator on a variety of cases and have participated in multiple cases that have focused on gang related matters.

8.      Since July 2012, I have been assigned to the NCRGTF. The San Diego County Sheriff's Department has appointed me an Associate Agent assigned to the Sheriff's Department Special Investigation Division and specifically assigned to the NCRGTF. During my time at the NCRGTF, I have had personal contact with dozens of self-admitted or known gang members and their associates and have discussed their lifestyles, method of operations regarding violent and property crimes, and their drug trafficking and drug distributing activities. I have participated in investigations involving criminal gang members including but not limited to Hispanic criminal street gangs and have performed various investigative tasks involving the following:

a.      Functioning as a surveillance agent and thereby observing and recording movements of gang members trafficking in illegal drugs and weapons, and those suspected of committing violent crimes and trafficking in illegal drugs and weapons;

b.      Tracing monies and assets gained by drug traffickers from the sale of illegal sale of drugs and weapons (laundering of monetary instruments);

c.      Interviewing dozens of witnesses, cooperating individuals, and confidential informants relative to gang activities including: violent acts, illegal trafficking of drugs and the distribution of monies and assets derived from illegal trafficking of drugs;

d.      Monitoring and reviewing thousands of recorded jail calls as well as recorded telephone calls pursuant to Title III court orders in narcotics and gang-related cases as well as handled Confidential Human Sources with access to drug dealers, firearms dealers, gang members and the Mexican Mafia hierarchy; and

e.      Supervising, as a case agent/co-case agent, specific investigations involving criminal gangs, trafficking of drugs, weapons and the laundering of monetary instruments.

9.      In my training and experience, I have learned that individuals engaged in narcotic trafficking often use their cell phones and electronic media to conspire, plan and coordinate their criminal activities and that cellphones and electronic media retain evidence of their crimes such as communications, photographs, videos, contact information of co-

1  conspirators, location data, travel arrangements, and financial data that evidence criminal
2  activities.

3                              FACEBOOK, INC.
4      10.    Facebook owns and operates a free-access social networking website of
5  the same name that can be accessed at http://www.facebook.com.  Facebook allows its
6  users to establish accounts with Facebook, and users can then use their accounts to
7  share written news, photographs, videos, and other information with other Facebook
8  users, and sometimes with the general public.

9      11.    Facebook asks users to provide basic contact and personal identifying
10 information to Facebook, either during the registration process or thereafter.  This
11 information may include the user's full name, birth date, gender, contact e-mail
12 addresses, Facebook passwords, Facebook security questions and answers (for
13 password retrieval), physical address (including city, state, and zip code), telephone
14 numbers, screen names, websites, and other personal identifiers.  Facebook also assigns
15 a user identification number to each account.

16     12.    Facebook users may join one or more groups or networks to connect and
17 interact with other users who are members of the same group or network.  A Facebook
18 user can also connect directly with individual Facebook users by sending each user a
19 "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the
20 two users will become "Friends" for purposes of Facebook and can exchange
21 communications or view information about each other.  Each Facebook user's account
22 includes a list of that user's "Friends" and a "News Feed," which highlights information
23 about the user's "Friends," such as profile changes, upcoming events, and birthdays.

24     13.    Facebook users can select different levels of privacy for the
25 communications and information associated with their Facebook accounts. By adjusting
26 these privacy settings, a Facebook user can make information available only to himself
27 or herself, to particular Facebook users, or to anyone with access to the Internet,
28 including people who are not Facebook users.  A Facebook user can also create "lists"

                                    4

of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

14.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

15.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

16.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat

communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

17.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

18.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

19.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

20.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

21.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

22.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

23.   Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

24.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:    profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

26.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

27.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the

1   user and the provider's support services, as well as records of any actions taken by the
2   provider or user as a result of the communications.

3       28.    Facebook tracks location data for mobile users.  The Facebook app has
4   access to a user's location data even when the user is not using the Facebook app.

5       29.    Therefore, the computers of Facebook are likely to contain all the material
6   described above, including stored electronic communications and information
7   concerning subscribers and their use of Facebook, such as account access information,
8   transaction information, and other account information.

9       FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

10       30.    Starting in December 2017, the FBI and the San Diego Sheriff Department
11   (SDSD), began investigating heroin and methamphetamine distribution by multiple
12   individuals in the San Diego area. Investigators have identified SWITZER, COLLINS,
13   Erin LILLIE, Walter ATKINS, and others as individuals coordinating the distribution of
14   heroin and methamphetamine in the San Diego area. As detailed below, SWITZER and
15   COLLINS used **Target Acount-1** and **-2** in order to facilitate the distribution of
16   methamphetamine.

17       31.    This investigation has included the use of a Confidential Sources (CS).[2] The
18   CS initially identified SWITZER and COLLINS as individuals engaged in the sale of

19   _____

20   [2] The CS's criminal history includes the following convictions: 1997 misdemeanor
conviction for PC 242/243 (Battery); 2001 misdemeanor conviction for H&S 11550(a)
21   (Under the Influence of a controlled substance); 2003 misdemeanor conviction for H&S
11550(a) (Under the influence of a controlled substance); 2006 felony conviction for
22   H&S 11378 (Possess controlled substance for sale); 2006 felony conviction for H&S
23   11378 (Possess controlled substance for sale); 2006 felony conviction for PC 487(a)
(Grand Theft); 2010 felony convictions for H&S 11379 (Transport controlled substance
24   for sale) and PC 459 (Burglary); 2012 felony conviction for H&S 11377(a) (Possess
25   controlled substance); 2013 misdemeanor conviction for PC 148(a) (Obstruct public
officer); 2014 felony convictions for PC 459 (Burglary) and HS11360 (Transport
26   marijuana for sale); and 2015 PC 3056 Parole Violation.  In November 2017, the CS
27   was arrested for a federal drug trafficking crime and subsequently plead guilty to that
crime. The CS is cooperating with law enforcement in hopes of favorable consideration
28   by the court at sentencing.  The CS has been paid for services and expenses.

narcotics. As outlined below, the CS has communicated with SWITZER and COLLINS via Facebook Messenger where they utilized **Target Account-1** and **-2** and via recorded phone calls and text messages with SWITZER, who used a telephone with number 310-697-9524, and COLLINS, who used a telephone with number 619-622-1216, in order to arrange narcotics transactions.

32.   On March 29, 2018, the CS conducted a controlled purchase of methamphetamine from SWITZER, COLLINS, and LILLIE.   The CS coordinated the narcotics transactions with SWITZER via recorded calls and texts and Facebook Messenger communication prior to the narcotics transaction.   For example, the CS and SWITZER, using **Target Account-1**, engaged in a Facebook Messenger conversation on March 28, 2018.  Pertinent portions of the conversation are summarized below:

SWITZER: [9:29 p.m.] "Hey, you want to get together tonight"

CS: [9:30 p.m.]  "Sure. I'm kind of busy looking for something right now."

SWITZER:  [9:31 p.m.]  "What kind of something....and how much? Maybe I can help"

CS:  [9:45 p.m.] "Well, a couple ozs [ounces]"

SWITZER:  [9:48 p.m.] "AMT per u ready to spend and how much u want to start with tonight"

CS: [9:48 p.m.] "2 for 5 [two ounces of methamphetamine for five hundred dollars]"

SWITZER [9:48 p.m.] "U got the 5 [five hundred dollars]"

CS:  [9:48 p.m.]  "Yep"

SWITZER:  [ 9:50 p.m.]  "2 for 5 that is ...I'm at pechanga right now but heading to mission valley...the dude with the shit [methamphetamine] is off University and 163 fwy"

SWITZER:  [9:50 p.m.]  "Let me call to make sure he's available and has it ....he always does or he gets it in like an hour so shouldn't be a problem"

CS:  [9:52 p.m.]  "Can you do that in the morning?"

SWITZER: [9:53 p.m.]  "Yes, that would be best anyway"

CS:  [9:54 p.m.]  "Ok what time would be good for you?"

SWITZER: [9:54 p.m.]  "I will get it setup then. If you want you can come along and I will just introduce you so u can do it yourself."

SWITZER:  [9:55 p.m.]  "Guys name is Walter [ATKINS] … old hippie type but pretty solid dude"

33.    The coordinate between SWITZER and the CS continued via recorded calls and text messages. On March 29, 2018, at approximately 9:49 a.m., the CS made a recorded call to SWITZER, using telephone number 310-697-9524.  During the recorded call, the CS greeted SWITZER by his first name "John" and SWITZER stated, "… I'm down here… in San Diego, on my way back up there right now… everything's actually is good to go… what do you want to do?"  The CS asked, "… do I need to go down there to meet you?"  SWITZER asked, "… do you want to meet me at Pechanga to go from there?"  The CS stated, "I'm in Oceanside" and they discussed potential meet locations.  The CS and SWITZER agreed to meet in Escondido that afternoon.

34.   On March 29, 2018, in the parking lot of the Dicks Sporting Goods store located in Escondido, California, the CS met with SWITZER, COLLINS, and LILLIE and they discussed the narcotics transaction. COLLINS directed the CS, SWITZER, and LILLIE to drive to the source of supply to pick up the narcotics for all of them; however, the CS informed COLLINS that the CS did not have enough time to make the trip to meet the source of supply. Instead, the CS asked COLLINS for a "sample" of the methamphetamine and indicated that the CS would purchase more at a later time. COLLINS provided the CS approximately 4.4 grams of methamphetamine for $60. LILLIE can be heard on the recording offering to pick up the narcotics from the source of supply and indicated that she had spoken to the source of supply earlier in the day.

The controlled purchase was recorded, transmitted and surveilled and agents and officers were able to monitor the narcotics transaction in real time. Investigators subsequently weighed and tested the purchased evidence, which tested presumptively positive as methamphetamine and had an approximate net weight of 4.4 grams.

35. Later that evening, at approximately 11:01 p.m., SWITZER, using telephone number 310-697-9524, sent a text message to the CS: "Got 2 plus 2 on deck. [SWITZER had the two ounces of methamphetamine that the CS originally ordered plus an additional two ounces of methamphetamine for sale.] Perfect, hit me up in the am. Nite." On March 30, 2018, at approximately 7:42 a.m., SWITZER sent another text message to the CS: "Hey [CS' name] this is John... We're up and ready... Let me know when you are ready to do this..."

36. On March 30, 2018, CS conducted a controlled purchase of methamphetamine from COLLINS and LILLIE. The CS coordinated the narcotics transactions with SWITZER, COLLINS and LILLIE via recorded calls and texts and Facebook Messenger communication prior to the narcotics transaction. For example, the CS engaged in a Facebook Messenger exchange with LILLIE and COLLINS, using **Target Account-2**, on March 30, 2018. Pertinent portions of the conversation are summarized below:

LILLIE/COLLINS: [1:22 p.m.] "Its LILLIE. John [SWITZER] is being unreasonable and im just not into it. If u need something give us a call. U can reach me on my moms [COLLINS] cell for now 6196221216"

CS: [1:22 p.m.] "I still want that"

LILLIE/COLLINS: [1:23 p.m.] "Thats cool we can do that me and my mom [COLLINS] are doing some errands"

LILLIE/COLLINS: [1:24 p.m.] "Ive got one on me now and we can get as much as you want"

LILLIE/COLLINS: [1:24 p.m.] "We had buyers last nite so .....we did what we had to"

LILLIE/COLLINS:  [1:24 p.m.]  "We can get u another one"

37.  On March 30, 2018, at approximately 2:13 p.m., COLLINS and LILLIE, using telephone number 619-622-1216, sent a text message to the CS: "Hey we r getting off the freeway.  Lets meet at in and out . ill let u buy us lunch ;) don't know where sweitzer [SWITZER] is and don't need the drama.  At approximately 2:19 p.m., CS responded via text message to COLLINS and LILLIE:  "i will be right there."

38.  On March 30, 2018, in the parking lot of the In-n-Out Burger in Escondido, California, the CS met with COLLINS and LILLIE. COLLINS drove a white Toyota 4Runner. LILLIE was the passenger in the vehicle. COLLINS provided the CS with approximately one ounce of methamphetamine in exchange for $260. The controlled purchase was recorded, transmitted and surveilled and agents and officers were able to monitor the narcotics transaction in real time. Investigators subsequently weighed and tested the purchased evidence, which tested presumptively positive as methamphetamine and had an approximate net weight of 28.1 grams.

39.  On April 17, 2018, the CS conducted a controlled purchase of methamphetamine from COLLINS. The CS coordinated the narcotics transactions with COLLINS via recorded calls and texts and Facebook Messenger communication prior to the narcotics transaction.  For example, the CS engaged in a Facebook Messenger exchange with COLLINS, using **Target Account-2**, on April 16, 2018.  Pertinent portions of the conversation are summarized below:

CS: [6:17 p.m]  "Can you give me a price on 4 [ounces of methamphetamine]"

COLLINS: [7:27 p.m.] "Let me get that price for you hang on"

COLLINS: [7:31 p.m.] "850"

COLLINS:  [7:32 p.m.]  "I only make 50 off it and some poop [methamphetamine] sound good?"

CS: [7:37 p.m.], CS to COLLINS: "Thats cool"

12

40.    The CS and COLLINS continued to coordinate the meeting  via recorded calls and text messages and eventually met on April 17, 2018.

41.    The April 17, 2018 controlled purchase was recorded, transmitted, and surveilled, and agents and officers were able to monitor the narcotics transaction in real time.  Surveillance agents followed the CS to pick up COLLINS in the parking lot of the Dicks Sporting Goods store in Escondido, California. The CS and COLLINS then drove in the CS's vehicle to the narcotics transaction. During the ride, COLLINS received a phone call and her side of the conversation was captured on recording. COLLINS confirmed the price and amount of the narcotics and the meet location as the Vons on Adams Street.  COLLINS can be heard stating, "… if you want to meet at Vons… you can meet on the other side and I can walk over… four [ounces]… you told me eight-fifty [$850]… I'll call you in just a few minutes… bye…" Surveillance agents followed the CS and COLLINS to the Vons located at 3610 Adams Ave, San Diego, California.  As the CS and COLLINS arrived at the Vons, COLLINS stated, "… I usually park… in the corner [of the Vons parking lot]… I'm leaving everything in here…" COLLINS can be heard on the phone again and her side of the conversation was captured on the recording, "… I'm walking over right now…" The CS counted out the money for COLLINS and stated, "… there's nine-forty [$940]]…" and asked, "… do you got to walk to his house?" COLLINS informed the CS that she was meeting the source of supply for the methamphetamine at the nearby Subway restaurant. Surveillance agents observed COLLNS exit the CS's vehicle and walk westbound down Adams Avenue towards the Subway restaurant located at 3540 Adams Ave, San Diego, California.  At approximately 5:30 p.m., surveillance agents observed COLLINS meet with ATKINS inside the Subway restaurant.  Surveillance agents followed the CS and COLLINS back to Escondido, California and monitored their conversation via the transmitter on the CS.  During the ride back, COLLINS described ATKINS' vehicle to the CS and informed the CS that ATKINS kept narcotics inside of his vehicle.

42. On April 25, 2018, ATKINS was stopped in his vehicle and arrested on a pending state felony warrant. Investigators searched ATKINS' vehicle pursuant to a federal search warrant. Investigators located over a pound of methamphetamine, over fifty grams of heroin, scales, drug packaging materials, and over ten thousand dollars in cash. Additionally, ATKINS' phone was seized and searched pursuant to the federal search warrant, which revealed messages sent from **Target Account-2** regarding the narcotics transaction that occurred on April 17, 2018.

43. Based on the above listed recorded calls, text messages, and Facebook Messenger conversations, I believe that SWITZER and COLLINS use **Target Accounts-1** and **-2** to communicate with both drug customers and drug suppliers to further their drug distribution activities.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

44. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook, Inc. (hereinafter "the internet service provider" or "the ISP") are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP. The impact on the ISP's business would be disruptive and severe.

45. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored videos, photographs, and any other content from the Facebook accounts, as described in **Attachments B-1 and B-2**. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. The copies will be provided to me or to any authorized federal agent. The copies will be

14

1   imaged and the images will then be analyzed to identify communications and other

2   electronic records subject to seizure pursuant to **Attachments B-1 and B-2**.  Relevant

3   electronic records will be copied to separate media.  The original media will be sealed

4   and maintained to establish authenticity, if necessary.

5       46.     Analyzing the data to be provided by the ISP may require special technical

6   skills, equipment, and software.  It may also be very time-consuming.  Searching by

7   keywords, for example, often yields many thousands of "hits," each of which must be

8   reviewed in its context by the examiner to determine whether the data is within the

9   scope of the warrant.  Merely finding a relevant "hit" does not end the review process.

10  Keyword searches do not capture misspelled words, reveal the use of coded language,

11  or account for slang.  Keyword searches are further limited when electronic records are

12  in or use foreign languages. Certain file formats also do not lend themselves to keyword

13  searches.    Keywords search text.    Many common electronic mail, database and

14  spreadsheet applications, which files may have been attached to electronic mail, do not

15  store data as searchable text.  Instead, such data is saved in a proprietary non-text

16  format. And, as the volume of storage allotted by service providers increases, the time

17  it takes to properly analyze recovered data increases dramatically. The ISP do not

18  always organize the electronic files they provide chronologically, which makes review

19  even more time consuming and may also require the examiner to review each page or

20  record for responsive material.

21      47.     Based on the foregoing, searching the recovered data for the information

22  subject to seizure pursuant to this warrant may require a range of data analysis

23  techniques and may take weeks or even months. Keywords need to be modified

24  continuously based upon the results obtained and, depending on the organization,

25  format, and language of the records provided by the ISP, examiners may need to review

26  each record to determine if it is responsive to **Attachment B-1 and B-2**. The personnel

27  conducting the examination will complete the analysis within ninety (90) days of receipt

28  of the data from the service provider, absent further application to this court.

48.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject accounts and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

49.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

### GENUINE RISK OF DESTRUCTION OF DATA

50.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, the data in **Target Account-1** and **Target Account-2** is being preserved by Facebook for approximately ninety days in anticipation of this application for search warrants.

### PRIOR ATTEMPTS TO OBTAIN DATA

51.     The United States has not attempted to obtain this data by other means other than the limited viewing of publically accessible content as described above.

### REQUEST FOR SEALING & PRECLUSION OF NOTICE

52.     This is an ongoing investigation of which the targets are unaware. There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. Accordingly, it is requested that this affidavit and its related materials be sealed until further order of the Court.

53.     In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel

1  essential to compliance with the execution of this warrant, until **August 17, 2018**, absent
2  further order of the court

3                          SERVICE ON FACEBOOK

4       54.    Because the warrant will be served on Facebook, who will then compile
5  the requested records, there is reasonable cause to permit the execution of the requested
6  warrant at any time in the day or night. Pursuant to Title 18 United States Code Section
7  2703(g), the presence of a law enforcement officer is not required for the service or
8  execution of this warrant.

9                              CONCLUSION

10      55.    Based on the foregoing, I believe there is probable cause to believe items
11  that constitute evidence of violations of federal criminal law, namely, of Title 21, United
12  States Code, Sections 841, 846, 952, 960 and 843, as described in **Attachments B-1**
13  and **B-2**, will be found in/ the properties to be searched, as provided in **Attachments**
14  **A-1 and A-2**.

15
16
17                                          Michael J. Rod
                                            FBI Special Agent
18  SUBSCRIBED and SWORN to before me
19  this /4th day of June, 2018
20
21
22  HON. KAREN S. CRAWFORD
23  United States Magistrate Judge
24
25
26
27
28
                              17